## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )    15-cr-10323-IT |
| | ) |
| DANIEL GIBSON and MARK KESNER, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF MOTION BY DEFENDANT MARK KESNER TO DISMISS INDICTMENT BASED ON VINDICTIVE PROSECUTION OR, IN THE ALTERNATIVE, FOR DISCOVERY AND EVIDENTIARY HEARING

Defendant Mark Kesner respectfully submits this memorandum in support of his motion to dismiss the indictment against him based on the government's vindictive prosecution of him in retaliation for the exercise of his Fifth Amendment right not to testify before the Grand Jury against Daniel Gibson. Alternatively, if the Court concludes that a further showing is required to warrant dismissal, Mr. Kesner respectfully requests that based on evidence to date of the government's vindictive prosecution, Mr. Kesner be allowed discovery on the issue, followed by an evidentiary hearing on this motion.

### Preliminary Statement

For more than three years, the government consistently treated Mr. Kesner as a witness against Daniel Gibson, who was Mr. Kesner's client in Mr. Kesner's accounting practice. As recently as October 2, 2015, the government sought to place Mr. Kesner in the Grand Jury as a witness against Mr. Gibson. Then, in a sudden about face – just six days after demanding that Mr. Kesner appear as a witness in the Grand Jury – the government retaliated by labeling him a target when it became clear that Mr. Kesner would maintain his invocation of Fifth Amendment rights not to testify.

Where the government retaliates against a defendant by prosecuting him in response to his exercise of well-established constitutional rights, the government violates the defendant's Fifth Amendment rights to due process. Such unconstitutional behavior requires dismissal of the retaliatory charges. Here, the government's blatant retaliation – evidenced most clearly by the sudden change in treatment of Mr. Kesner between October 2, 2015 and October 8, 2015, without any change in the evidence concerning him – amounts to vindictive prosecution and a violation of Mr. Kesner's constitutional rights. The indictment as to Mr. Kesner should be dismissed.

## Factual Basis for Motion

### The government treated Mr. Kesner as a witness for more than three years, throughout its investigation of Mr. Gibson

The government first contacted Mr. Kesner more than three and a half years ago, expressly treating him as a witness in its investigation of Mr. Gibson, who is now Mr. Kesner's co-defendant. More specifically, the history of this matter dates back to at least May 2012, when IRS investigators contacted Mr. Kesner regarding the Gibson investigation, interviewed him about Mr. Gibson, and served him with a deposition summons in a matter designated "In the Matter of Daniel P. Gibson." (*See* Declaration of Joshua L. Solomon, submitted herewith, Exs. A and B.)

Shortly after Mr. Kesner was interviewed without counsel, he retained counsel who began having communications with the lead IRS case agent. (*Id.* ¶ 4.) Over the course of approximately three years, the case agent repeatedly told counsel that Mr. Kesner was viewed as a witness and *not* a target with respect to the Gibson matter. (*Id.* ¶¶ 4-5.) In an early call with the case agent in May 2012, for example, the case agent told Mr. Kesner's counsel that his investigation was an investigation of suspected criminal conduct by Mr. Gibson *only*, and said

that "I need him [Mr. Kesner] as a witness" and that he was "looking for a witness, not someone to charge." (*Id.* ¶ 5.) During that same call, the IRS case agent informed Mr. Kesner's counsel that if something were to change with respect to Mr. Kesner's status, he would tell counsel about the change, explaining that his office had a practice of giving particular advisory rights when the agent believed a person with whom he was talking might have been engaged in criminal activity. (*Id.*)

In another example, counsel for Mr. Kesner spoke to the case agent in May 2013, about a year into the matter. During that call, the case agent reiterated that Mr. Kesner was *not* a target of the investigation, going so far as to acknowledge that Mr. Kesner and his firm had not been engaged to perform an audit or a review of the books on which Mr. Gibson's tax returns at issue were based. (*Id.* ¶ 7.)

Mr. Kesner's counsel informed the IRS case agent that based on Fifth Amendment concerns, Mr. Kesner would not provide testimony at a deposition pursuant to the summons that he had been given or agree to be interviewed. (*Id.* ¶ 6.) The case agent expressed unhappiness about his inability to obtain Mr. Kesner's testimony, stating again, in this context, that Mr. Kesner was not the target of his investigation. (*Id.*) The case agent nonetheless respected the invocation of Fifth Amendment rights and made no effort to further compel Mr. Kesner's appearance – a respect that the government would eventually abandon abruptly once the U.S. Attorney's Office became involved and the lead prosecutor became convinced that Mr. Kesner would not abandon his Fifth Amendment rights and assist in the prosecution of Mr. Gibson.

Based on these repeated representations that Mr. Kesner was viewed as a witness and not a target, Mr. Kesner's counsel – who initially represented only Mr. Kesner – undertook to jointly represent Mr. Kesner and Mr. Kesner's employer, Kesner, Godes & Morrissey ("KGM"),

working with the IRS case agent as requested to provide information that the IRS sought from KGM during the investigation of Mr. Gibson. (*Id.* ¶ 8.)

Counsel for Mr. Kesner continued having sporadic interactions with the case agent into March 2015, when the case agent hand-delivered to counsel a Grand Jury subpoena for Mr. Kesner. (*Id.* ¶ 9.) Through the date he delivered the subpoena, the case agent had never changed Mr. Kesner's status or provided the advisory of rights that he told counsel his office provided when a witness was suspected of criminal activity. (*Id.*)

**The U.S. Attorney's Office reaffirms Mr. Kesner's status as a witness against Mr. Gibson, and then indicts him in retaliation for his exercising his Fifth Amendment rights not to testify for the prosecution in the Grand Jury**

Consistent with the treatment of Mr. Kesner as a witness for almost three years at the point the matter was handed over to the U.S. Attorney's Office, the Grand Jury subpoena required Mr. Kesner's appearance before the Grand Jury *as a witness*, and was not accompanied by a target letter or any other warnings that one would expect if Mr. Kesner were a target of the Grand Jury proceedings to which he was being subpoenaed. (*Id.* ¶ 9 & Ex. C.)

In significant part based on the consistent message that Mr. Kesner was a witness only, Mr. Kesner's counsel represented Mr. Kesner jointly with KGM and two of Mr. Kesner's colleagues, Meradee Jowder and Michael Morrissey, who were also subpoenaed to give testimony as witnesses to the Grand Jury. (*Id.* ¶ 8.) This representation included document productions, appearances of Ms. Jowder and Mr. Morrissey for testimony before the Grand Jury, and a multi-year civil litigation involving Mr. Gibson. (*Id.*) Jointly representing all three witnesses in response to the Grand Jury subpoenas, Mr. Kesner's counsel engaged in discussions and correspondence with AUSA Stephen Heymann (referred to herein as "the lead prosecutor") beginning in March 2015. At the outset, when he learned that counsel would represent all three witnesses, the lead prosecutor stated that he did not see any conflict with a joint representation of

4

all three witnesses, all of whom had by that point been identified by the IRS and by the U.S. Attorney's Office as witnesses, and all of whom had been interviewed by case agents about the matter and subpoenaed to appear as witnesses before the Grand Jury. (*Id.* ¶ 10.) Mr. Kesner and Ms. Jowder, through counsel, informed the lead prosecutor that they would both likely invoke their Fifth Amendment rights before the Grand Jury. The lead prosecutor took issue with Ms. Jowder's invocation of Fifth Amendment rights, telling counsel that he did not understand the basis for her to do so based on what he knew. (*Id.* ¶ 11.) The lead prosecutor then discussed the possibility of a proffer by Mr. Kesner and Ms. Jowder, subject to a proffer letter, in advance of any Grand Jury appearance. Their counsel agreed to review a proposed proffer letter, but explained his view that the standard form used by the United States Attorney's Office in this District was inadequate to provide meaningful protection for witnesses invoking Fifth Amendment rights. (*Id.* ¶ 12.)

The lead prosecutor sent proposed proffer letters for Mr. Kesner and Ms. Jowder, in an effort to determine whether, with the "protections" of a proffer letter, they would abandon their Fifth Amendment rights to remain silent, which their counsel had told the lead prosecutor they would likely invoke. Both Mr. Kesner and Ms. Jowder eventually declined the proffer invitations, based on their counsel's view – explained to the lead prosecutor – regarding the adequacy of these form proffer letters. (*Id.* ¶ 13.)

Clearly frustrated by counsel's advice that led to these witnesses' invoking their constitutional rights, the lead prosecutor changed his view from his original discussion with counsel. Specifically, he sent the proposed proffer letters to counsel with a cover email stating that he was "frankly, growing concerned that [counsel] may have a conflict in representing them both." (*Id.* ¶ 13 and Ex. D.) The only thing that had changed in the brief time since the lead

prosecutor stated his view that there was no conflict was that counsel had informed him that the witnesses' Fifth Amendment rights were implicated and had explained counsel's views that the proposed proffer letters were inadequate in light of those rights. Counsel responded that there was no conflict (as the lead prosecutor himself had earlier acknowledged before determining that he did not like the advice counsel was providing), and thus made clear that none of the three witnesses would be obtaining new counsel. (*Id.*)

The lead prosecutor responded the following day, further attempting to interfere with the attorney-client relationship now that he knew counsel's advice with respect to the Fifth Amendment and a potential proffer. He wrote that "whether Mr. Kesner facilitated, participated in, encouraged or conspired with Mr. Gibson to file false tax returns is an open question in our investigation." (*Id*) With respect to Ms. Jowder, the lead prosecutor also wrote that "her interest in proffering and taking other steps may well be in conflict with Mr. Kesner's." (*Id.*) This email said nothing to explain his apparent change in position from first stating that Ms. Jowder did not even have a valid basis for invoking Fifth Amendment rights, to stating that she may have an "interest in proffering." The lead prosecutor also further sought to interfere with the attorney-client relationship, writing "[t]his conflict may well be exacerbated if Mr. Kesner or his firm is paying [Ms. Jowder's] legal fees." (*Id.*) This issue of legal fees had never been raised previously. Rather, it arose only after counsel had informed the prosecutor that he was inclined to recommend that Ms. Jowder invoke her Fifth Amendment rights and that counsel's views were that the standard proffer letter was inadequate to overcome that invocation. (*Id.* ¶ 14.)

The lead prosecutor's statements were inconsistent with what Mr. Kesner had been told for three years, since mid-2012; were inconsistent with the government subpoenaing Mr. Kesner *as a witness* before the Grand Jury; and, while appearing close to target language with regard to

Mr. Kesner, appeared to make deliberate use of the phrase "open question" so as not to convey that Mr. Kesner had in fact become a target (in fact, as discussed below, the government later made clear, again, that Mr. Kesner was *not* a target, when it again subpoenaed him to the Grand Jury months later). Counsel for Mr. Kesner explained these inconsistencies at the time. (*Id.* Ex. E.) As counsel further explained, the government would not have served a Grand Jury subpoena on Mr. Kesner if he were a target without adequate warnings. (*Id.*) Nevertheless, counsel invited the lead prosecutor to share any information he had learned that could have changed his position from their previous discussion, if in fact he had truly become concerned about a possible conflict in counsel's representing both Mr. Kesner and Ms. Jowder, both of whom had consistently been identified as witnesses. (*Id.*) The lead prosecutor provided no such information, then or since. (*Id.* ¶ 15.)

At that point, the lead prosecutor had made his effort to interfere with the attorney-client relationship based on his displeasure with counsel's advice regarding Fifth Amendment rights, but when that effort failed, he appeared to move on. With respect to Ms. Jowder, the government arranged for an immunity order – contrary to the earlier statement that it would not do so without a proffer – thus mooting the earlier claim that among the bases for a potential conflict was "her interest in proffering and taking other steps may well be in conflict with Mr. Kesner's." (*Id.* Ex. F.) Ms. Jowder subsequently testified before the Grand Jury. (*Id.* ¶ 16.) With respect to Mr. Kesner, in the months following this exchange, and as late as October 2, 2015, the government continued to treat him as a witness, and *not* a target.

On October 2, 2015, the lead prosecutor wrote to Mr. Kesner's counsel to ask him to accept service of another subpoena for Mr. Kesner to appear as a witness before the Grand Jury. He wrote: "I am going to be subpoenaing your client, Mr. Kesner, to the grand jury on

Wednesday October 21st. The date, I am afraid, is inflexible. Will you accept service on his behalf?" (*Id.* Ex. G.) The "inflexibility," it was clear, was due to the imminent end of the Grand Jury proceedings as to Mr. Gibson, as a statute of limitations period appeared to approach.[1]

Mr. Kesner's counsel attempted multiple times to call the lead prosecutor to discuss this perplexing email, sent despite Mr. Kesner having previously made clear that he would invoke his Fifth Amendment rights if compelled to appear before the Grand Jury. Receiving no call in response to multiple messages, counsel wrote to the lead prosecutor as follows on Monday, October 5: "I left you a few voicemails. Can you please give me a call? I can accept service of the subpoena. But I would like to discuss it with you too." (*Id.* ¶ 18 & Ex. H.) Still the calls went unreturned, with the lead prosecutor instead writing, "Thx.  Will give you a call towards the end of the week, if I can." (*Id.* ¶ 18 & Ex. H.) Two days later, still without returning counsel's calls, the lead prosecutor sent another subpoena, addressed to KGM, and asked counsel to accept service. (*Id.* ¶ 19 & Ex. I.) Mr. Kesner's counsel responded again, "Can we please discuss this, as well as the Mark Kesner subpoena that I understand is coming?" (*Id.* Ex. I.)

As the lead prosecutor was aware from the earlier interactions described above, Mr. Kesner would, upon counsel's advice, invoke his Fifth Amendment rights if forced to appear before the Grand Jury. In fact, in addition to the history described above, the lead prosecutor had previously expressly told Mr. Kesner's counsel that Mr. Kesner need not appear before the Grand Jury as originally subpoenaed, given his stated intention to invoke his Fifth Amendment Rights. (*Id.* ¶ 18.) The fact that counsel then repeatedly attempted to contact Mr. Heymann, by phone and email, to discuss the October 2 email that demanded a Grand Jury appearance further made that intention clear. It thus appeared that, on the verge of making a final charging decision

---

[1]  The Indictment, which was issued on October 28, 2015, alleges a relevant tax filing by Mr. Gibson in early November 2009. (*See* Doc. No. 1 at 6.)

with respect to Mr. Gibson, and eager to obtain Mr. Kesner's testimony before doing so, the government was attempting to exert pressure on Mr. Kesner to abandon his Fifth Amendment rights. Having concluded that Mr. Kesner was not ready to waive those rights if subpoenaed a second time, the lead prosecutor suddenly, after almost three and a half years, changed course.

On October 8, 2015, just six days after telling counsel that he intended to require Mr. Kesner's appearance as a witness before the Grand Jury, the lead prosecutor called Mr. Kesner's counsel to inform counsel that he was now considering Mr. Kesner a target. The lead prosecutor provided no explanation as to what, if anything, had changed in the six days since he had said that he would be subpoenaing Mr. Kesner to testify on a date that was "inflexible." (*Id.* ¶ 20.)

Following that October 8 discussion, Mr. Kesner's counsel subsequently attempted to reach the lead prosecutor again to discuss the timing of a charging decision and, if charged, Mr. Kesner's voluntary surrender so as to avoid the embarrassment and indignity of a surprise arrest. Those two voicemails went unanswered. (*Id.* ¶ 21.) Instead, in a further show of vindictiveness, the government had Mr. Kesner arrested on his way to work on November 2, 2015, without the lead prosecutor ever returning counsel's call or providing an opportunity for a voluntary surrender. (*Id.*)

## DISCUSSION

**I.** **Mr. Kesner exercised well-established constitutional rights under the Fifth Amendment, which apply despite his innocence of the crimes charged.**

As the Court will learn if this case proceeds further, the charges against Mr. Kesner are exceptionally weak. Consistent with the government's treatment of Mr. Kesner as a witness for more than three years, right up until October 8, 2015, Mr. Kesner is at most a witness to and an unwitting participant in the tax-fraud scheme that the government has alleged with respect to Mr. Gibson's personal taxes. When Mr. Kesner refused, based on his Fifth Amendment rights, to

appear as a witness in support of the government's case against Mr. Gibson, however, the government retaliated by charging him. It did so knowing that while the case against him is virtually non-existent, his need to defend himself at trial would necessarily assist the government's prosecution of Mr. Gibson.

Mr. Kesner's innocence, however, does not mean that he had nothing to fear when refusing to testify. As the Supreme Court has made unambiguously clear on multiple occasions, the Fifth Amendment is not designed to protect only the guilty, but also "serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Slochower v. Bd. of Higher Ed. of City of New York*, 350 U.S. 551, 557-58 (1956). Accordingly, "one of the basic functions of the privilege [against self-incrimination] is to protect innocent men." *Grunewald v. United States*, 353 U.S. 391, 421 (1957). The concerns that the Fifth Amendment seeks to address in this regard are particularly strong in the context of "secret proceedings," such as Grand Jury appearances, where a witness is deprived of the presence of counsel and other basic protections. *Id.* at 422-23. The situation for Mr. Kesner, who was an accountant involved in the preparation of Mr. Gibson's tax returns, is a perfect example of "ambiguous circumstances" that can lead reasonable people to invoke Fifth Amendment rights, even when innocent.

Given Mr. Kesner's role as Mr. Gibson's accountant, whose firm compiled Mr. Gibson's financial information into tax-return format, it is no surprise that he would feel exposed to potential prosecution to a sufficient degree to trigger Fifth Amendment concerns. *See United States v. Castro*, 129 F.3d 226, 229 (1st Cir. 1997) ("[T]he prospective witness need only limn some reasonable possibility that, by testifying, he may open himself to prosecution."). Indeed, even the lead prosecutor, while expressly and unambiguously treating Mr. Kesner as a witness as

late as October 2, 2015, and while taking issue with Ms. Jowder's invocation of the Fifth Amendment, has never claimed that Mr. Kesner had an insufficient basis for doing so.

As a result of these well-established constitutional protections, Mr. Kesner repeatedly made clear his intent to avail himself of them. First, the IRS interviewed Mr. Kesner prior to his obtaining counsel and, when doing so, served him with a summons to give a deposition in a matter expressly captioned "In the Matter of Daniel P. Gibson." Once he obtained and conferred with counsel, Mr. Kesner refused to testify pursuant to the summons or to speak further with the IRS, invoking his Fifth Amendment rights. The government sought to reassure him, repeatedly, over that period that it viewed him as only a witness. He nevertheless persisted in his invocation of the Fifth Amendment and did not testify during the IRS's investigation. (*See supra* at 2-4.)

Next, when the U.S. Attorney's Office became involved and the matter proceeded before the Grand Jury, Mr. Kesner was again subpoenaed as a witness, confirming that he was still viewed as a witness and not a target. He again invoked his Fifth Amendment rights. The government attempted to bully him into abandoning those rights, or at least to convince him to obtain different counsel than the one who was advising him on those rights. Mr. Kesner did not relent, and refused to testify. (*See supra* at 4-8.)

Finally, on October 2, 2015, just six days before belatedly and suddenly labeling him a target, the government *again* asserted that it would call Mr. Kesner as a witness before the Grand Jury, going so far as to insist on a particular date for his appearance, which the government said was "inflexible." His counsel repeatedly attempted to contact the lead prosecutor to discuss that demand in light of Mr. Kesner's invocation of his Fifth Amendment rights and the lead prosecutor's having earlier stated that he would not force Mr. Kesner to appear merely to invoke those rights on the witness stand. (*See supra* at 7-8.)

11

In short, despite the extraordinary weaknesses in any case against him, Mr. Kesner had well-established Fifth Amendment protections available to him when he refused to testify, and he repeatedly invoked those rights up to the virtual end of the Grand Jury proceedings.

## II.    The government vindictively reclassified Mr. Kesner as a target and charged him, thus violating his due process rights.

The Supreme Court has long made clear that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Thus, when the government vindictively prosecutes a defendant, the government "violates a defendant's Fifth Amendment right to due process." *United States v. Lanoue*, 137 F.3d 656, 664 (1st Cir. 1998) (citing *Goodwin*, 457 U.S. at 372). "[E]vidence of prosecutorial vindictiveness can result in the dismissal of an indictment, as a violation of a defendant's Fifth Amendment right to due process." *United States v. Cafiero*, 292 F.Supp.2d 242, 247 (D. Mass. 2003).

When presenting a vindictive-prosecution defense, the defendant can either present "facts [that] show an actual vindictiveness or a sufficient likelihood of vindictiveness to warrant such a presumption." *Lanoue*, 137 F.3d at 664. Recognizing the difficulty of obtaining direct evidence of a prosecutor's improper mindset, the Supreme Court has explained the basis for use of a presumption where there is at least a "reasonable likelihood" of vindictiveness:

> Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to "presume" an improper vindictive motive. Given the severity of such a presumption, however – which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct – the Court has done so only in cases in which a reasonable likelihood of vindictiveness exists.

*Goodwin*, 457 U.S. at 372.

Furthermore, where a "reasonable likelihood" of vindictiveness exists, and thus a presumption of vindictiveness is warranted, "the burden shifts to the government to show that legitimate reasons exist for the prosecution." *Lanoue*, 137 F.3d at 664; *see also Cafiero*, 292 F.Supp.2d at 247 ("If the defendant demonstrates a presumption of vindictiveness, the government bears the burden of rebutting the presumption by offering objective evidence justifying the prosecutor's action.").

The record already developed demonstrates more than enough to trigger a presumption of vindictiveness, and thus a shifting of the burden to the government. For almost three and a half years, the government consistently told Mr. Kesner that he was, and treated him as, a witness, not a target, in its investigation concerning Mr. Gibson's tax filings. Even when the IRS handed the matter over to the U.S. Attorney's Office, the latter issued a subpoena to Mr. Kesner *as a witness*, in March 2015. (*See supra* at 4.)

As late as October 2, 2015, the government made clear that Mr. Kesner was still viewed as a witness, when the lead prosecutor wrote to say that he was issuing a Grand Jury subpoena and that he would need Mr. Kesner to testify by a particular "inflexible" date, as the Grand Jury proceedings were coming to an end with respect to Mr. Gibson. (*See supra* at 7.) There thus can be no doubt that even at that late date, the government was viewing and treating Mr. Kesner as a witness from whom it sought information as to Mr. Gibson, and *not* a target. In fact, that the lead prosecutor recognized the need to call Mr. Kesner's counsel on October 8, 2015 to announce that Mr. Kesner was *now* viewed as a target confirms the fact that until that point, he was viewed and treated differently.

When Mr. Kesner's counsel promptly and repeatedly reached out following the October 2 email to discuss the announced subpoena in light of Mr. Kesner's earlier-stated intention to

invoke Fifth Amendment rights, the government knew that it would not be able to obtain Mr.

Kesner's testimony before concluding its Grand Jury proceedings as to Mr. Gibson. The

government thus knew that it would be unable to obtain Mr. Kesner's testimony against Mr.

Gibson prior to indicting Mr. Gibson. It retaliated by abruptly reclassifying Mr. Kesner as a

target and then charging him.

Mr. Kesner is not aware of any facts that the government learned or any evidence it

obtained in the mere six days between October 2, 2015 and October 8, 2015 that could warrant a

sudden change in treatment of him after three and a half years. *See United States v. Cafiero*, 292

F.Supp.2d 242, 248 (D. Mass. 2003) (finding a presumption of vindictive prosecution in part

based on the government's previously having the evidence on which it based its indictment). Nor

is there anything in the government's automatic discovery that could justify such a sudden

change in status. To the contrary, the government's automatic discovery is consistent with its

treatment of Mr. Kesner as a witness for years. The government has produced various notes of

witness interviews, each of which makes clear that the investigation was an investigation *of Mr.*

*Gibson*, not Mr. Kesner. In fact, the government's own writings reveal that it considered this

matter one about Mr. Gibson's alleged wrongdoing, right into November of this year. More

specifically, the government has produced the following (all emphasis added):

- An IRS Memorandum of Conversation concerning a meeting with a witness, in
  which both the lead prosecutor and the IRS Special Agent in charge of the
  investigation participated, showing that as late as November 5, 2015 – *after* the
  indictments – the government was still referring to its "Investigation Name" as
  "Daniel Peter Gibson." (Solomon Decl. Exhibit J at 1.) The Memorandum also
  refers to the Grand Jury's investigation as being about "***DANIEL GIBSON's***
  ***alleged criminal tax deficiencies***." (*Id.*)

- An April 16, 2015 IRS Memorandum of Conversation concerning a meeting in
  which both the lead prosecutor and the IRS Special Agent in charge participated,
  which also refers to the Investigation Name as "Daniel Peter Gibson," and
  describes the purpose of the meeting as "to discuss information [the witness] may

have relevant to ***the grand jury investigation of DANIEL GIBSON's alleged criminal tax deficiencies***." (*Id.* Ex. K.)

- April 10 and April 15, 2015 IRS Memoranda of Conversations with other witnesses, which use the same Investigation Name ("Daniel Peter Gibson") and the same description of the grand jury investigation ("***DANIEL GIBSON's alleged criminal tax deficiencies***"). (*Id.* Exs. L and M.)

- A July 3, 2012 IRS Memorandum of Interview, which uses the Investigation Name "Daniel Peter Gibson" and states that the IRS Special Agent informed the witness that "he was conducting an investigation into possible criminal violations of internal revenue laws ***committed by DANIEL GIBSON***." (*Id.* Ex. N.)

- An August 23, 2012 Memorandum of Interview that reports that the IRS Special Agent "reminded [the witness] he was conducting ***a criminal investigation of Daniel Gibson's tax liabilities***." (*Id.* Ex. O.)

- A June 1, 2012 IRS Memorandum of Interview that describes the investigation as into "alleged criminal violations of internal revenue laws ***committed by DANIEL GIBSON***." (*Id.* Ex. P.)

- An August 22, 2012 Memorandum of Interview that uses the Investigation Name "Daniel Peter Gibson" and refers to the investigation as "***the DANIEL GIBSON investigation***." (*Id.* Ex. Q.)

- Four other IRS Memoranda of Contact and Interview reflecting an Investigation Name of "Daniel Peter Gibson" or "Daniel Gibson," none of which identifies Mr. Kesner as the subject of the investigation. (*Id.* Exs. A, R, S, & T.)

Despite all indications that the government viewed Mr. Kesner as a witness, and that it was intending to subpoena him as a witness as late as October 2, 2015, it suddenly changed course just six days later, treating him as a target beginning on October 8, 2015 and charging him shortly thereafter. Without any change in evidence in those six days to warrant its abandonment of the approach that it had taken over the previous three-plus years, the most likely explanation, perhaps the only viable explanation, is prosecutorial vindictiveness based on the government's frustration over its inability to obtain Mr. Kesner's testimony against Mr. Gibson before it concluded its Grand Jury proceedings. The government's message through this conduct is unambiguous and frightening, even Orwellian: give the government the testimony it wants, or be

prosecuted yourself. This conduct is all the more telling given that this is not the first time that

this prosecutor has been accused of responding vindictively to a defendant's exercise of

constitutional rights.[2]

---

[2]  Rule 404(b) evidence of similar prior conduct may inform the Court's view of the prosecutor's motives in targeting Mr. Kesner after Mr. Kesner's exercise of his Fifth Amendment rights. In a letter to the Department of Justice's Office of Professional Responsibility, counsel for the late Aaron Swartz, who eventually committed suicide during the pendency of a prosecution of him, wrote to accuse this same prosecutor not only of *Brady* violations, but also of threatening Mr. Swartz with seven *years* in prison if he exercised his constitutional right to a trial, compared to an offer of four to six *months* if he gave up his right to a trial and pled guilty. Defense counsel wrote as follows in that letter: "[The prosecutor] offered to recommend that Mr. Swartz serve four to six months in prison if Mr. Swartz agreed to plead guilty to thirteen felony offenses. But if Mr. Swartz chose to exercise his right to a jury trial, and was found guilty of those very same offenses, [the prosecutor] threatened that he would seek for Mr. Swartz to serve seven years in prison." (Solomon Decl. Ex. U, at 6.) Threatening Mr. Swartz with more than seven *years* if he fought the charges, while simultaneously concluding that a four to six *months'* sentence was sufficient punishment – an increase of 14 to 21 times longer in prison merely because the defendant exercised his constitutional right to go to trial – reflects obvious distain for a defendant's exercise of constitutional rights. Furthermore, evidence from MIT, whose network Mr. Swartz allegedly misused, and which was thus identified as a "victim," further corroborates this prosecutor's dislike for the exercise of constitutional rights by those who come into his crosshairs. A report released publicly by MIT included this information concerning a discussion with this prosecutor:

> MIT's counsel noted that no one at the Institute was looking forward to the time, disruption and stress involved in testifying at hearings and trial. The prosecutor's response was that it disturbed him whenever a defendant "systematically revictimized" the victim, and ***that was what Swartz was doing by dragging MIT through hearings and a trial***. He analogized attacking MIT's conduct in the case to attacking a rape victim based on sleeping with other men.

(*Id.* Ex. V, at 67 (emphasis added).) Note the depiction of the defendant as "dragging MIT through . . . a trial," and thereby acting like a rapist, rather than as a citizen exercising his constitutional rights when accused of a crime. Equally disturbing was this exchange, also described in the MIT report, in which the same prosecutor appears to have reacted vindictively to Mr. Swartz's exercise of First Amendment rights:

> The prosecutor said that, pre-indictment, he had wanted to approach the case on a human level, not punitively. To this extent he made an extremely reasonable proposal, and was "dumb-founded" by Swartz's response.

> The prosecutor said that the straw that broke the camel's back was that when he indicted the case, and allowed Swartz to come to the courthouse as opposed to being arrested, Swartz used the time to post a "wild Internet campaign" in an effort to drum up support. This was a "foolish" move that moved the case "from a human one-on-one level to an institutional level." The lead prosecutor said that on the institutional level cases are harder to manage both internally and externally. [cont'd]

At the very least, this record shows that a vindictive motivation is "reasonably likely," thus giving rise to a presumption of vindictiveness that the government is tasked with attempting to rebut.

**III.   If the Court concludes that the record of vindictiveness at this stage is inadequate to warrant dismissal, Mr. Kesner should be allowed limited discovery on the issue and an evidentiary hearing.**

As discussed above, the record to date is sufficient to demonstrate vindictiveness – including the absence of *any* indication of new evidence in the six days after the lead prosecutor stated that he would require Mr. Kesner to appear before the Grand Jury as a witness – and at least sufficient to raise a presumption of vindictiveness. But even if the Court concluded otherwise, Mr. Kesner should be permitted discovery, followed by an evidentiary hearing, concerning the motivations behind the sudden shift in treatment of him.

Far less of a showing is required to obtain discovery into prosecutorial mindset than what is required to achieve dismissal. As this Court has held in allowing discovery for purposes of exploring vindictiveness, "[o]f course, Defendant need not yet prove either actual vindictiveness *or the likelihood of vindictiveness. . . .* [T]he court need only address whether discovery on the

---

(*Id.* at 68.) This exchange apparently led to MIT, the alleged "victim," expressing concern about exercising its own First Amendment rights, for fear that the government might not like what it had to say:

> This conversation supported the following conclusions, consistent with OGC's [the MIT Office of the General Counsel's] earlier views:
>
> . . . .[T]he lead prosecutor's comment about a "wild Internet campaign" orchestrated by Swartz to drum up support made MIT concerned that any public statements that MIT might make on Swartz's behalf could backfire.

(*Id.*) The report went further to conclude, based on this interaction with the same lead prosecutor here, that "[g]iven the lead prosecutor's comments to MIT's outside counsel . . . MIT statements would seemingly have had little impact, and even risk making matters worse. . . ." (*Id.* at 86.) Whether it is Fifth Amendment rights as in this case, the constitutionally protected right to a jury trial in the Swartz matter, or First Amendment rights to speak out publicly, these incidents evidence a willingness to react vindictively to citizens' exercising their constitutional rights.

claim is warranted." *United States v. Dwyer*, 287 F.Supp.2d 82, 88 (D. Mass. 2003) (emphasis added). The First Circuit has described the necessary showing as merely requiring the defendant to "come forth with *'some' objective evidence* tending to show the existence of prosecutorial vindictiveness." *United States v. Bucci*, 582 F.3d 108, 113 (2009) (emphasis added).

Mr. Kesner has easily satisfied this standard here. He has presented not just "'some' objective evidence tending to show" vindictiveness. Rather, he has presented strong evidence of an improper motive: three-plus years' of treatment expressly as a witness; assurances that he was not a target; and a stated intention to serve a third witness subpoena just six days before the government changed his status, *without any change in the evidence* – but after it was clear to the government that it would not succeed in getting Mr. Kesner to abandon his Fifth Amendment rights before concluding its Grand Jury proceedings against Mr. Gibson. Mr. Kesner has come forward with "something more than a mere chronology, i.e., an invocation of the Fifth Amendment followed by an indictment." *Dwyer*, 287 F.Supp.2d at 89.

Furthermore, the discovery that Mr. Kesner has sought from the government, and that the government has refused to provide, is narrowly tailored to focus on the classification of Mr. Kesner as a witness for three-plus years, the sudden reclassification of him as a target, and evidence learned on or after October 2, 2015. Specifically, Mr. Kesner made a very narrow discovery request following receipt of the government's automatic discovery, which confirmed both the absence of new evidence during the relevant time, and the government's consistent focus on Mr. Gibson, not Mr. Kesner, during its investigation. Mr. Kesner requested that the government produce the following materials to him (*see* Doc. No. 29):

1. Evidence that the government contends is inculpatory as to Mr. Kesner and that it discovered on or after October 2, 2015;

2. Transcripts of those portions of the Grand Jury proceedings that relate to Mr. Kesner and that are dated on or after October 2, 2015;

3. Communications, including notes or memoranda of communications, that relate to Mr. Kesner and that are dated on or after October 2, 2015; and

4. A log of communications, memoranda, or other documents that address charging decisions with respect to Mr. Kesner or Mr. Kesner's status as a witness, person of interest, subject, or target.[3]

These requests are narrowly framed to address the specific issue of vindictiveness. *See Dwyer*, 287 F.Supp.2d at 91 (ordering discovery of grand jury transcripts, reports of investigators, and written or documentary information the government received for the relevant time frame related to the new information that the government claimed). Yet the government has refused to provide *any* of the requested information. (*See* Doc. No. 31.) It should be ordered to do so.

A holding that deprived Mr. Kesner not just of the presumption of vindictiveness that the Supreme Court has recognized is permitted given the elusiveness of direct evidence of improper motive, but that went even further to deprive him also of discovery into the prosecutor's motives under these suspicious circumstances, would ensure that prosecutors before this Court would feel free to punish witnesses for invoking well-established Fifth Amendment rights, so long as they were not so brash as to admit expressly that they were doing so. If discovery were not permitted here, it is difficult to imagine a situation where it would be warranted.

Finally, once the government has produced this discovery, Mr. Kesner should be permitted to renew his motion to dismiss and given an evidentiary hearing on it.

---

[3] Mr. Kesner originally sought a broader scope of information from the government, which the government refused. The government then made its automatic disclosures, which appeared to confirm the absence of new evidence after October 2, 2015. Mr. Kesner's counsel thus followed up on the automatic discovery with a new request that sought a narrower scope of material. (*See* Doc. No. 29.)

## Conclusion

Based on the foregoing, this Court should dismiss the indictment as against Mr. Kesner. In the alternative, the Court should permit the limited discovery requested here, followed by an evidentiary hearing on Mr. Kesner's motion to dismiss.

Respectfully submitted,

Mark Kesner,
By his attorney,
/s/ Joshua L. Solomon
Joshua L. Solomon (BBO # 657761)
POLLACK SOLOMON DUFFY LLP
133 Federal Street, Suite 902
Boston, MA  02110
(617) 439-9800
Email: jsolomon@psdfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on December 30, 2015.

/s/ Joshua L. Solomon