## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 15-cr-10323-IT |
| | ) | |
| DANIEL GIBSON and MARK KESNER, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT MARK KESNER'S OBJECTION TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE CONCERNING MOTION TO DISMISS INDICTMENT BASED ON VINDICTIVE PROSECUTION OR, IN THE ALTERNATIVE, FOR DISCOVERY AND EVIDENTIARY HEARING

Joshua L. Solomon (BBO # 657761)
POLLACK SOLOMON DUFFY LLP
133 Federal Street, Suite 902
Boston, MA  02110
(617) 439-9800
jsolomon@psdfirm.com

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BASIS FOR MR. KESNER'S MOTION ............................................... 2

    The government treated Mr. Kesner as a witness for more than three years,
        throughout its investigation of Mr. Gibson ............................................... 2

    The U.S. Attorney's Office reaffirms Mr. Kesner's status
        as a witness against Mr. Gibson ................................................................. 4

    The government abruptly deems Mr. Kesner a target and indicts him in retaliation
        for his exercising his Fifth Amendment rights not to testify for the prosecution......... 8

DISCUSSION ........................................................................................................ 10

  I.   Mr. Kesner exercised well-established constitutional rights under the Fifth
       Amendment, which apply despite his innocence of the crimes charged...................... 10

  II.  The R&R's conclusion that there is insufficient evidence to trigger a presumption
       of vindictiveness is contrary to law and to the evidence before the Court. ................ 11

  III. If the Court concludes that the record of vindictiveness at this
       stage is inadequate to warrant dismissal, Mr. Kesner should be allowed
       limited discovery on the issue. ................................................................... 18

Conclusion ........................................................................................................... 20

Defendant Mark Kesner respectfully submits this objection to the August 11, 2016 Report and Recommendation (the "R&R") issued by Magistrate Judge Cabell on Mr. Kesner's motion to dismiss the indictment based on the government's vindictive prosecution in retaliation for the exercise of Fifth Amendment rights not to testify before the Grand Jury, or, in the alternative, for discovery. Mr. Kesner respectfully requests that the Court, which reviews the R&R *de novo*, Fed. R. Crim. P. 59(b), decline to accept the R&R and instead dismiss the indictment against him. Alternatively, Mr. Kesner should be permitted limited discovery into his vindictive-prosecution claim, followed by an evidentiary hearing.

## PRELIMINARY STATEMENT

Recognizing that direct evidence of vindictiveness – such as an admission – will rarely be available, the Supreme Court established an alternative approach through which a defendant can employ a presumption of vindictiveness, shifting the burden to the government to rebut the presumption. The R&R applies an impossibly high standard for triggering the presumption. If adopted, that standard would essentially eliminate the presumption as a viable alternative, contrary to Supreme Court and First Circuit authority. Furthermore, by relegating Mr. Kesner's alternative request for discovery to a footnote, without additional analysis, the R&R fails to recognize the lower hurdle for obtaining discovery, which was easily satisfied here.

For more than three years, the government consistently treated Mr. Kesner as a witness against Daniel Gibson, who was Mr. Kesner's client in Mr. Kesner's accounting practice. As recently as October 2, 2015, the government sought to place Mr. Kesner in the Grand Jury as a prosecution witness against Mr. Gibson. Then, in a sudden about face – just six days after demanding that Mr. Kesner appear as a witness in the Grand Jury – the government retaliated by labeling him a target when it became clear that Mr. Kesner would maintain his invocation of Fifth Amendment rights not to testify as the Grand Jury proceedings came to an end.

When the government retaliates against a defendant by prosecuting him in response to his exercise of constitutional rights, the government violates the defendant's right to due process. Such unconstitutional behavior requires dismissal of the retaliatory charges. Here, the government's blatant retaliation – evidenced most clearly by the sudden change in treatment of Mr. Kesner between October 2, 2015 and October 8, 2015, without any change in the evidence – amounts to vindictive prosecution and a violation of Mr. Kesner's constitutional rights.

## FACTUAL BASIS FOR MR. KESNER'S MOTION

### The government treated Mr. Kesner as a witness for more than three years, throughout its investigation of Mr. Gibson

The government first contacted Mr. Kesner more than four years ago, expressly treating him as a witness in its investigation of Mr. Gibson, who is now Mr. Kesner's co-defendant. In May 2012, IRS investigators contacted Mr. Kesner regarding the Gibson investigation, interviewed him about Mr. Gibson, and served him with a deposition summons in a matter designated "In the Matter of Daniel P. Gibson." (*See* Declaration of Joshua L. Solomon (Doc. No. 35, filed in support of Mr. Kesner's motion), Exs. A and B.)

Shortly after Mr. Kesner was interviewed, he retained counsel who began having communications with the lead IRS case agent. (Solomon Decl. ¶ 4.) Over the course of approximately three years, the case agent repeatedly, and expressly, told counsel that Mr. Kesner was viewed as a witness and *not* a target. (*Id.* ¶¶ 4-5.) In an early call in May 2012, for example, the case agent stated that his investigation was an investigation of suspected criminal conduct by Mr. Gibson *only*, that "I need him [Mr. Kesner] as a witness," and that he was "looking for a witness, not someone to charge." (*Id.* ¶ 5.) During that same call, the case agent informed Mr. Kesner's counsel that if something were to change with respect to Mr. Kesner's status, he would tell counsel, explaining that his office had a practice of giving particular advisory rights when it

2

believed a person with whom it was talking might have been engaged in criminal activity. (*Id.*) In another example in May 2013, about a year into the matter, the case agent reiterated that Mr. Kesner was *not* a target of the investigation, going so far as to acknowledge that Mr. Kesner and his firm had not been engaged to perform an audit or a review of the books on which Mr. Gibson's tax returns were based. (*Id.* ¶ 7.)

Mr. Kesner's counsel informed the IRS case agent that based on Fifth Amendment concerns, Mr. Kesner would not provide testimony at a deposition pursuant to the summons that he had been given. (*Id.* ¶ 6.) The case agent expressed unhappiness about his inability to obtain Mr. Kesner's testimony, stating again that Mr. Kesner was not the target of his investigation. (*Id.*) The case agent nonetheless respected the invocation of Fifth Amendment rights and made no further effort at the time to compel testimony.[1]

Based on these repeated representations that Mr. Kesner was a witness and not a target, Mr. Kesner's counsel undertook to jointly represent Mr. Kesner and Mr. Kesner's employer, Kesner, Godes & Morrissey ("KGM"), working with the IRS case agent as requested to provide information that the IRS sought from KGM during the investigation of Mr. Gibson. (*Id.* ¶ 8.)

Counsel for Mr. Kesner continued having sporadic interactions with the case agent into March 2015, when the case agent hand-delivered to counsel a Grand Jury subpoena for Mr. Kesner. (*Id.* ¶ 9.) Through the date he delivered the subpoena, the case agent had never changed Mr. Kesner's status. (*Id.*)

---

[1]  The R&R incorrectly states that "[f]rom August of 2012 through 2014, there was virtually no interaction between the IRS Agent and Attorney Solomon save for one conversation in May of 2013." (R&R at 3.) While the declaration in support of Mr. Kesner's motion referred to various conversations, including one in May 2013, it made clear that these were *examples*, not an exhaustive listing of them. As it does not appear that the government disputes that the case agent repeatedly and consistently identified Mr. Kesner as only a witness, and the R&R's conclusion does not depend on a contrary view, this error may be inconsequential. Mr. Kesner notes it here so that his silence is not interpreted as agreement with the R&R's factual statement to the extent it could become relevant at a later stage.

3

**The U.S. Attorney's Office reaffirms Mr. Kesner's status as a witness against Mr. Gibson**

Consistent with the treatment of Mr. Kesner as a witness for almost three years at the point the matter was handed over to the U.S. Attorney's Office, the March 2015 Grand Jury subpoena required Mr. Kesner's appearance before the Grand Jury *as a witness*, and was not accompanied by a target letter or any other warnings that one would expect if Mr. Kesner were a target of the Grand Jury proceedings to which he was being subpoenaed. (*Id.* ¶ 9 & Ex. C.)

In significant part based on the consistent message that Mr. Kesner was a witness only, Mr. Kesner's counsel represented Mr. Kesner jointly with KGM and two of Mr. Kesner's colleagues, Meradee Jowder and Michael Morrissey, who were also subpoenaed to give testimony as witnesses. (*Id.* ¶ 8.) This representation included document productions, appearances of Ms. Jowder and Mr. Morrissey for Grand Jury testimony, and a multi-year civil litigation involving Mr. Gibson. (*Id.*) Jointly representing all three witnesses in response to the Grand Jury subpoenas, Mr. Kesner's counsel engaged in discussions and correspondence with AUSA Stephen Heymann (referred to herein as "the lead prosecutor") beginning in March 2015.

At the outset, when he learned that counsel would represent all three witnesses, the lead prosecutor stated expressly that he did *not* see any conflict with a joint representation of all three witnesses, all of whom had by that point been identified by the IRS and by the U.S. Attorney's Office as witnesses, all of whom had been interviewed by case agents about the matter, and all of whom were subpoenaed to appear as witnesses before the Grand Jury. (*Id.* ¶ 10.) Mr. Kesner and Ms. Jowder, through counsel, informed the lead prosecutor that they would both likely invoke their Fifth Amendment rights before the Grand Jury. The lead prosecutor then discussed the possibility of a proffer, subject to a proffer letter. Their counsel agreed to review a proposed letter, but explained his view that the forms used by the U.S. Attorney's Office in this District were often inadequate to provide meaningful protection for witnesses. (*Id.* ¶ 12.)

4

The lead prosecutor sent proposed proffer letters for Mr. Kesner and Ms. Jowder, in an effort to determine whether they would abandon their Fifth Amendment rights with the "protections" of a proffer letter. Both Mr. Kesner and Ms. Jowder eventually declined the proffer invitations, based on their counsel's view – explained to the lead prosecutor – regarding the inadequacy of these form proffer letters. (*Id.* ¶ 13.)

Clearly frustrated by counsel's advice that led to these witnesses' invoking their constitutional rights, the lead prosecutor changed his view from his original discussion with counsel just days earlier. Specifically, on April 1, 2015, he sent the proposed proffer letters with a cover email stating that he was "frankly, growing concerned that [counsel] may have a conflict in representing them both." (*Id.* ¶ 13 and Ex. D.) The only thing that had changed since the lead prosecutor stated the exact opposite view that there was no conflict was that counsel had informed him that the witnesses' Fifth Amendment rights were implicated and had explained counsel's view that the standard proffer letters were inadequate. Counsel responded that there was no conflict (as the lead prosecutor himself had earlier acknowledged before determining that he did not like the advice counsel was providing), and thus made clear that none of the three witnesses would be obtaining new counsel. (*Id.*)

The lead prosecutor responded the following day, further attempting to interfere with the attorney-client relationship now that he knew counsel's advice with respect to the Fifth Amendment and a potential proffer. He wrote that "whether Mr. Kesner facilitated, participated in, encouraged or conspired with Mr. Gibson to file false tax returns is an open question in our investigation." (*Id*) He further attempted to interfere with the attorney-client relationship, writing that "[t]his conflict may well be exacerbated if Mr. Kesner or his firm is paying [Ms. Jowder's] legal fees." (*Id.*) This issue of legal fees had never been raised previously. Rather, it arose only

5

after counsel informed the prosecutor that he was inclined to recommend that Ms. Jowder invoke her Fifth Amendment rights and that counsel's views were that the standard proffer letter was inadequate to overcome that invocation. (*Id.* ¶ 14.)

The lead prosecutor's statements were inconsistent with what Mr. Kesner had been told for three years, since mid-2012; were inconsistent with the government subpoenaing Mr. Kesner *as a witness* before the Grand Jury; and appeared to make deliberate use of the phrase "open question" so as not to convey that Mr. Kesner had in fact become a target (in fact, as discussed below, the government later made clear, again, that Mr. Kesner was *not* a target). Counsel for Mr. Kesner explained these inconsistencies at the time. (*Id.* Ex. E.) As counsel further explained, the government would not have served a Grand Jury subpoena on Mr. Kesner if he were a target without adequate warnings. (*Id.*) Nevertheless, counsel invited the lead prosecutor to share any information he had learned that could have changed his position from their previous discussion, if in fact he had truly become concerned about a possible conflict in counsel's representing both Mr. Kesner and Ms. Jowder, both of whom had consistently been identified as witnesses. (*Id.*) The lead prosecutor provided no such information, then or since. (*Id.* ¶ 15.)

At that point, the lead prosecutor had made his effort to interfere with the attorney-client relationship based on his displeasure with counsel's advice regarding Fifth Amendment rights, but when that effort failed, he appeared to move on. With respect to Ms. Jowder, the government arranged for an immunity order – contrary to the earlier statement that it would not do so without a proffer – thus mooting the earlier claim that among the bases for a potential conflict was that "her interest in proffering and taking other steps may well be in conflict with Mr. Kesner's." (*Id.* Ex. F.) Ms. Jowder subsequently testified before the Grand Jury. (*Id.* ¶ 16.) With respect to Mr. Kesner, in the months following this exchange, and as late as October 2, 2015, the government

6

continued to treat him as a witness, and *not* a target.

On October 2, 2015, the lead prosecutor wrote to Mr. Kesner's counsel to ask him to accept service of another subpoena for Mr. Kesner to appear as a witness: "I am going to be subpoenaing your client, Mr. Kesner, to the grand jury on Wednesday October 21st. The date, I am afraid, is inflexible. Will you accept service on his behalf?" (*Id.* Ex. G.) The "inflexibility" was due to the imminent end of the Grand Jury proceedings as to Mr. Gibson, as a statute of limitations period approached. Mr. Kesner's counsel attempted multiple times to call the lead prosecutor to discuss this perplexing email, as Mr. Kesner had previously made clear that he would invoke his Fifth Amendment rights if compelled to appear. Receiving no call in response to multiple messages, counsel wrote to the lead prosecutor on Monday, October 5: "I left you a few voicemails. Can you please give me a call? I can accept service of the subpoena. But I would like to discuss it with you too." (*Id.* ¶ 18 & Ex. H.) Still the calls went unreturned. The lead prosecutor instead wrote, "Thx. Will give you a call towards the end of the week, if I can." (*Id.* ¶ 18 & Ex. H.) Two days later, still without returning the calls, the lead prosecutor sent a subpoena addressed to KGM, and asked counsel to accept service. (*Id.* ¶ 19 & Ex. I.) Mr. Kesner's counsel responded again, "Can we please discuss this, as well as the Mark Kesner subpoena that I understand is coming?" (*Id.* Ex. I.)

As the lead prosecutor was aware from the earlier interactions described above, Mr. Kesner would, upon counsel's advice, invoke his Fifth Amendment rights if forced to appear before the Grand Jury. In fact, in addition to the history described above, the lead prosecutor had previously expressly told Mr. Kesner's counsel that Mr. Kesner need not appear as originally subpoenaed, given his stated intention to invoke his Fifth Amendment Rights. (*Id.* ¶ 18.) The fact that counsel then repeatedly attempted to contact the lead prosecutor, by phone and email, to

7

discuss the October 2 email that demanded a Grand Jury appearance further made that intention clear. It thus appeared that, on the verge of making a final charging decision with respect to Mr. Gibson, and eager to obtain Mr. Kesner's testimony before doing so, the government was testing Mr. Kesner's willingness to abandon his Fifth Amendment rights. Having concluded that Mr. Kesner was not ready to do so if subpoenaed a second time, the lead prosecutor suddenly, after almost three and a half years, changed course.

**The government abruptly deems Mr. Kesner a target and indicts him in retaliation for his exercising his Fifth Amendment rights not to testify for the prosecution**

On October 8, 2015, *just six days* after telling counsel that he intended to require Mr. Kesner's appearance *as a witness* before the Grand Jury, the lead prosecutor called Mr. Kesner's counsel to inform counsel that he was *now* considering Mr. Kesner a target. The lead prosecutor provided no explanation as to what, if anything, had changed in the six days since he had said that he would be subpoenaing Mr. Kesner to testify on a date that was "inflexible." (*Id.* ¶ 20.)

This announcement was not only inconsistent with what the lead prosecutor, and the lead IRS agent before him, had conveyed for three and a half years, but it was also inconsistent with the government's own internal documents that eventually came to light in discovery. The government's own writings, including the following, reveal that it considered this matter one about Mr. Gibson's alleged wrongdoing, right into November of last year (all emphasis added):

- A memorandum concerning a meeting with a witness, in which both the lead prosecutor and the IRS agent participated, showing that as late as November 5, 2015 – *after* the indictments – the government was still referring to its "Investigation Name" as "Daniel Peter Gibson," and to the Grand Jury's investigation as being about "***DANIEL GIBSON's alleged criminal tax deficiencies***." (*Id.* Ex. J at 1.)

- An April 16, 2015 memorandum concerning a meeting in which both the lead prosecutor and the IRS agent participated, which refers to the Investigation Name as "Daniel Peter Gibson," and describes the purpose of the meeting as "to discuss information [the witness] may have relevant to ***the grand jury investigation of DANIEL GIBSON's alleged criminal tax deficiencies***." (*Id.* Ex. K.)

8

- April 10 and April 15, 2015 memoranda concerning witness meetings, which use the same Investigation Name ("Daniel Peter Gibson") and the same description of the Grand Jury investigation ("***DANIEL GIBSON's alleged criminal tax deficiencies***"). (*Id.* Exs. L and M.)

- A July 3, 2012 memorandum, which uses the Investigation Name "Daniel Peter Gibson" and states that the agent informed the witness that "he was conducting an investigation into possible criminal violations of internal revenue laws ***committed by DANIEL GIBSON***." (*Id.* Ex. N.)

- An August 23, 2012 memorandum that reports that the IRS agent "reminded [the witness] he was conducting ***a criminal investigation of Daniel Gibson's tax liabilities***." (*Id.* Ex. O.)

- A June 1, 2012 memorandum that describes the investigation as "alleged criminal violations of internal revenue laws ***committed by DANIEL GIBSON***." (*Id.* Ex. P.)

- An August 22, 2012 memorandum that uses the Investigation Name "Daniel Peter Gibson" and refers to the investigation as "***the DANIEL GIBSON investigation***." (*Id.* Ex. Q.)

- Four other memoranda reflecting an Investigation Name "Daniel Peter Gibson" or "Daniel Gibson," none of which identifies Mr. Kesner as the subject of the investigation. (*Id.* Exs. A, R, S, & T.)

Following the October 8 discussion in which the lead prosecutor stated, for the first time, that he was considering Mr. Kesner a target, Mr. Kesner's counsel subsequently attempted to reach the lead prosecutor again to discuss the timing of a charging decision and, if charged, Mr. Kesner's voluntary surrender so as to avoid the embarrassment and indignity of a surprise arrest. Those two voicemails also went unanswered. (*Id.* ¶ 21.) Instead, in a further show of vindictiveness, the government had Mr. Kesner arrested on his way to work, without the lead prosecutor ever returning counsel's call or allowing a voluntary surrender. (*Id.*)

**DISCUSSION**

**I.      Mr. Kesner exercised well-established constitutional rights under the Fifth Amendment, which apply despite his innocence of the crimes charged.**

As the Court will learn if this case proceeds further, the charges against Mr. Kesner are exceptionally weak. In attempting to explain away its sudden about-face on October 8, 2015, the government even referred to Mr. Kesner as "on the bubble" between being charged and not. (Tr. of 4/21/16 Hearing, at 71.) Consistent with the government's treatment of Mr. Kesner as a witness for more than three years, right up until October 8, 2015, Mr. Kesner is at most a witness to and an unwitting participant in the alleged tax-fraud scheme that the government has charged with respect to Mr. Gibson's personal taxes.

Mr. Kesner's innocence, however, does not mean that he had nothing to fear when called on to testify. As the Supreme Court has made unambiguously clear on multiple occasions, the Fifth Amendment is not designed to protect only the guilty, but also "serves to protect the innocent who otherwise might be ensnared by ambiguous circumstances." *Slochower v. Bd. of Higher Ed. of City of New York*, 350 U.S. 551, 557-58 (1956). Accordingly, "one of the basic functions of the privilege [against self-incrimination] is to protect innocent men." *Grunewald v. United States*, 353 U.S. 391, 421 (1957). The concerns that the Fifth Amendment seeks to address in this regard are particularly strong in the context of "secret proceedings," such as Grand Jury appearances, where a witness is deprived of the presence of counsel and other basic protections. *Id.* at 422-23.

Given Mr. Kesner's role as Mr. Gibson's accountant, whose firm compiled Mr. Gibson's financial information into tax-return format (but was not hired to perform an audit or even a review of the information), it is no surprise that he would feel exposed to a sufficient degree to trigger Fifth Amendment concerns. *See United States v. Castro*, 129 F.3d 226, 229 (1st Cir.

1997) ("[T]he prospective witness need only limn some reasonable possibility that, by testifying, he may open himself to prosecution."). Thus, despite the extraordinary weaknesses in any case against him, Mr. Kesner had well-established Fifth Amendment protections available to him when he refused to testify, and he repeatedly invoked those rights up to the virtual end of the Grand Jury proceedings.

**II.    The R&R's conclusion that there is insufficient evidence to trigger a presumption of vindictiveness is contrary to law and to the evidence before the Court.**

The Supreme Court has long made clear that "[t]o punish a person because he has done what the law plainly allows him to do is a due process violation 'of the most basic sort.'" *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)). Thus, when the government vindictively prosecutes a defendant, it "violates a defendant's Fifth Amendment right to due process." *United States v. Lanoue*, 137 F.3d 656, 664 (1st Cir. 1998) (citing *Goodwin*, 457 U.S. at 372). "[E]vidence of prosecutorial vindictiveness can result in the dismissal of an indictment, as a violation of a defendant's Fifth Amendment right to due process." *United States v. Cafiero*, 292 F.Supp.2d 242, 247 (D. Mass. 2003).

When presenting a vindictive-prosecution defense, the defendant can either present "facts [that] show an actual vindictiveness or a sufficient likelihood of vindictiveness to warrant such a presumption." *Lanoue*, 137 F.3d at 664. Recognizing the difficulty of obtaining direct evidence of a prosecutor's improper mindset, the Supreme Court explained in *Goodwin*, 457 U.S. at 372, the need for a presumption where there is at least a "reasonable likelihood" of vindictiveness:

> Motives are complex and difficult to prove. As a result, in certain cases in which action detrimental to the defendant has been taken after the exercise of a legal right, the Court has found it necessary to "presume" an improper vindictive motive. Given the severity of such a presumption, however – which may operate in the absence of any proof of an improper motive and thus may block a legitimate response to criminal conduct – the Court has done so only in cases in which a reasonable likelihood of vindictiveness exists.

Furthermore, where a "reasonable likelihood" of vindictiveness exists, and thus a presumption is warranted, "the government bears the burden of rebutting the presumption by offering objective evidence justifying the prosecutor's action." *Cafiero*, 292 F.Supp.2d at 247.

The record already developed demonstrates enough to trigger a presumption of vindictiveness, thus shifting the burden to the government. For almost three and a half years, the government consistently told Mr. Kesner that he was, and treated him as, a witness, not a target. Even when the IRS handed the matter over to the U.S. Attorney's Office, the latter issued a subpoena to Mr. Kesner *as a witness* for the prosecution against Mr. Gibson. (*See supra* at 4.) The government's internal documents, from both before and after the U.S. Attorney's Office's involvement, confirm this view. (*See supra* at 8-9.) As late as October 2, 2015, the lead prosecutor made clear that he planned to subpoena Mr. Kesner to the Grand Jury as a witness.

When Mr. Kesner's counsel promptly and repeatedly reached out following the October 2 email in light of Mr. Kesner's earlier-stated intention to invoke Fifth Amendment rights, the government knew that it would not be able to obtain Mr. Kesner's testimony before concluding its Grand Jury proceedings as to Mr. Gibson. The government thus knew that it would be unable to obtain Mr. Kesner's testimony against Mr. Gibson prior to indicting Mr. Gibson. It retaliated by abruptly reclassifying Mr. Kesner as a target and then charging him.

There are no facts that the government learned, or any evidence it obtained, in the mere six days between October 2, 2015 and October 8, 2015 that could warrant a sudden change in treatment after three and a half years. *See Cafiero*, 292 F.Supp.2d at 248 (finding a presumption of vindictive prosecution in part based on government's previously possessing the evidence on which it based its indictment). The government essentially acknowledged the absence of any such new evidence when it did not claim otherwise in opposing Mr. Kesner's motion or submit

12

any evidence developed after Mr. Kesner's reliance on Fifth Amendment rights. It merely referred to him repeatedly as "on the bubble" between being prosecuted and not throughout the U.S. Attorney's Office's involvement. (*See* Tr. of 4/21/16 Hearing, at 63, 66, 71, 72.) Without any change in evidence to warrant its abandonment of the approach the government had taken over the previous three-plus years, the most likely explanation for the change, perhaps the only viable explanation, is the government's frustration over its inability to obtain Mr. Kesner's testimony against Mr. Gibson before it concluded its Grand Jury proceedings. This record more than suffices to demonstrate a "reasonable likelihood" of vindictiveness

Respectfully, the R&R's contrary conclusion is not supported by the record. The R&R places particular emphasis on the lead prosecutor's April 2, 2015 email in which he referred to Mr. Kesner's culpability as an "open question." (*See supra* at 5.) As the R&R explains its position, "[a]mong other things, the record shows that the prosecutor had since March of 2015 taken a sort of dual track approach with respect to the defendant, viewing him as both a possible witness and a possible target." (R&R at 10.) But the record reveals nothing of the sort – particularly in the face of the then-recent issuance of a Grand Jury witness subpoena to Mr. Kesner, three years' of express treatment of him as a witness only, the subsequent events in October, and the government's internal writings. The R&R's reliance on the "open question" email fails to recognize the context in which that email was sent. The R&R states,

> on April 1, 2015, the prosecutor, having been told that the defendant would not testify before the grand jury, sent Attorney Solomon proposed proffer letters for Kesner and Jowder, but signaled counsel that the defendant had criminal exposure. Further, when counsel challenged this notion, the prosecutor responded, in writing, that "whether Mr. Kesner facilitated, participated in, encouraged or conspired with Mr. Gibson to file false tax returns is an open question in our investigation."

(*Id.*) Missing from this description, however, is that up until that point, even the lead prosecutor had *never* indicated that Mr. Kesner had any exposure. Also missing is that the "open question"

email was written to justify a claim of conflict, just days after the lead prosecutor stated that he did *not* see any conflict in Kesner and other colleagues being jointly represented, and right after defense counsel informed the lead prosecutor that both clients would invoke their Fifth Amendment rights and that counsel did not view the U.S. Attorney's Office's standard proffer letter as providing adequate protection of those rights. In short, the email was itself an improper reaction to counsel's invocation of both Mr. Kesner's and Ms. Jowder's Fifth Amendment rights, tied to the lead prosecutor's effort to bully Mr. Kesner or Ms. Jowder, or both, to obtain new counsel through a claim of a possible conflict – *after* learning that current counsel was advising them to invoke their Fifth Amendment rights. That sequence of events reveals the April 2, 2015 email as entirely consistent with a vindictive approach and with hostility toward invocation of Fifth Amendment rights. The R&R's analysis, however, removes that email from its full context.

In any event, however one views the April exchange, the government again affirmed that Mr. Kesner was viewed as a witness six months later, at the end of its Grand Jury proceedings, when the lead prosecutor announced in writing on October 2 that he was sending a subpoena for Mr. Kesner to appear as a witness before the Grand Jury. The lead prosecutor even stated that he would need Mr. Kesner to testify by a particular "inflexible" date, as the Grand Jury proceedings were coming to an end with respect to Mr. Gibson. (*See supra* at 7.) There thus can be no doubt that even at that late date, the government was viewing and treating Mr. Kesner as a witness from whom it sought information as to Mr. Gibson, and *not* a target. In fact, that the lead prosecutor recognized the need to call Mr. Kesner's counsel on October 8, 2015 to announce that Mr. Kesner was *now* viewed as a target confirms the fact that until that point, he was viewed and treated differently. The government's internal documents through that date further corroborate that Mr. Kesner was *not* the investigation's target. (*See supra* at 8-9.)

Furthermore, while recognizing that the four-part inquiry that some courts use to assess claims of vindictiveness does *not* apply in the First Circuit (*see* R&R at 8, n.2), the R&R appears to place significant weight on those factors. It concludes, for example, that there is no reason to believe that the lead prosecutor had any particular stake in Mr. Kesner's invocation of his Fifth Amendment rights, as prosecutors routinely expect that defendants will invoke procedural rights. This analysis, however, does not recognize that the lead prosecutor here appeared to put particular weight on Mr. Kesner's testimony. That weight is not surprising. It is not difficult to foresee in a prosecution of this type that Mr. Gibson may defend himself by claiming that it was the accountant's work that led him unwittingly to file allegedly false returns, making the accountant's testimony particularly critical. In other words, unable to obtain Mr. Kesner's testimony because of his invocation of rights against self-incrimination, the prosecutor has responded by putting Mr. Kesner in a position in which he must defend himself, thereby presumably pointing a finger at Mr. Gibson and giving the prosecutor what he wanted in the first place, evidence against Mr. Gibson at the expense of honoring Mr. Kesner's fundamental rights.

Furthermore, the multiple attempts to obtain Mr. Kesner's testimony, including one in October even after Mr. Kesner had already invoked his Fifth Amendment rights multiple times, as well as the prosecutor's threatening reaction to learning that Mr. Kesner would invoke his rights and learning that a proffer letter would not overcome that invocation, all support the conclusion that this particular prosecutor viewed Mr. Kesner's testimony as particularly important to his case.[2]

---

[2]  Furthermore, whatever one may assume about how prosecutors generally react to invocations of constitutional rights, this particular prosecutor simply may not be typical in that regard. This is not the first time he has responded harshly to exercises of constitutional rights that he perceives as interfering with his case. Rule 404(b) evidence of similar prior conduct may inform the Court's view of the prosecutor's motives in targeting Mr. Kesner. In a letter to the Department of Justice's Office of

Finally, the R&R mistakenly assessed the government's burden when concluding that even if the presumption had been triggered, it was rebutted. First, it relies on the fact that Mr. Kesner does not contend that there was insufficient evidence to indict him, from which the R&R

---

Professional Responsibility, counsel for the late Aaron Swartz wrote to accuse this same prosecutor of threatening Mr. Swartz with seven *years* in prison if he exercised his right to a trial, compared to an offer of four to six *months* if he gave up that right: "[The prosecutor] offered to recommend that Mr. Swartz serve four to six months in prison if Mr. Swartz agreed to plead guilty to thirteen felony offenses. But if Mr. Swartz chose to exercise his right to a jury trial, and was found guilty of those very same offenses, [the prosecutor] threatened that he would seek for Mr. Swartz to serve seven years in prison." (Solomon Decl. Ex. U, at 6.) Having concluded that a four to six *months'* sentence was sufficient punishment, the prosecutor's threat of more than seven *years* if Mr. Swartz fought the charges reflects obvious distain for a defendant's exercise of constitutional rights. Furthermore, evidence from MIT, whose network Mr. Swartz allegedly misused, and which was thus identified as a "victim," further corroborates this dislike for the exercise of constitutional rights. A report released publicly by MIT included the following:

> MIT's counsel noted that no one at the Institute was looking forward to the time, disruption and stress involved in testifying at hearings and trial. The prosecutor's response was that it disturbed him whenever a defendant "systematically revictimized" the victim, and ***that was what Swartz was doing by dragging MIT through hearings and a trial***. He analogized attacking MIT's conduct in the case to attacking a rape victim based on sleeping with other men.

(*Id.* Ex. V, at 67 (emphasis added).) Note the depiction of the defendant as "dragging MIT through . . . a trial," and thereby acting like a rapist, rather than as a citizen exercising his constitutional trial rights when accused of a crime. Equally disturbing was this exchange, also described in the MIT report, regarding vindictive reaction to the exercise of First Amendment rights:

> The prosecutor said that, pre-indictment, he had wanted to approach the case on a human level, not punitively. To this extent he made an extremely reasonable proposal, and was "dumb-founded" by Swartz's response.
>
> The prosecutor said that the straw that broke the camel's back was that when he indicted the case, and allowed Swartz to come to the courthouse as opposed to being arrested, Swartz used the time to post a "wild Internet campaign" in an effort to drum up support. This was a "foolish" move that moved the case "from a human one-on-one level to an institutional level." The lead prosecutor said that on the institutional level cases are harder to manage both internally and externally.

(*Id.* at 68.) This exchange even led to MIT, the alleged "victim," expressing concern about exercising its own First Amendment rights. (*Id.* ("[T]he lead prosecutor's comment about a "wild Internet campaign" orchestrated by Swartz to drum up support made MIT concerned that any public statements that MIT might make on Swartz's behalf could backfire.").) Whether it is Fifth Amendment rights as in this case, the constitutional right to a jury trial, or First Amendment rights to speak out publicly, these incidents evidence a willingness to react vindictively to citizens' exercising their constitutional rights.

concludes that there must have been a valid reason for indicting. Quite apart from the fact that, as

Chief Judge Sol Wachtler famously stated, a prosecutor can "indict a ham sandwich" given the

exceptionally low bar for indictments, the test for rebutting a vindictiveness presumption is not

merely whether there was enough to indict. Were that the case, a claim of vindictive prosecution

would conflate with a claim that the indictment is fatally flawed in its own right – but it is not so

easy to excuse vindictiveness. Instead, the government's rebuttal evidence must consist of

*changed* circumstances between the invocation of the protected rights and the indictment, which

justify a change in the defendant's treatment. Even the caselaw on which the R&R relies for its

rebuttal analysis makes clear that there must be changed circumstances. In *United States v.*

*Safavian*, 649 F.3d 688, 694 (D.C. Cir. 2011), for example, the court explained that "the

Government changed its trial strategy *in response to an adverse ruling of the court*" (emphasis

added). Here, the government did not even attempt a showing of changed circumstances.

Furthermore, the quotation from *United States v. Jenkins*, 537 F.3d 1, 5 (1st Cir. 2008), that the

R&R uses to support the incorrect notion that the presumption is rebutted so long as there was

enough evidence to indict did *not* concern the test for rebutting the presumption. Rather, it

addressed the defendant's attempt to argue that there was direct evidence of vindictiveness, as

opposed to the presumption regime, based on the claim that there was no possible objective basis

for the government's conduct (in that case, filing a notice of prior conviction to enhance a

sentence). It was in *that* context, not in a discussion of what it takes to rebut the presumption

once triggered, that the *Jenkins* court explained that "Defendant does not dispute the factual basis

for the section 851 information [i.e. notice of prior conviction]; indeed, he admits to the prior

convictions. It thus defies common sense to say that the government had no 'objective reason'

for filing the section 851 information." *Id.* at 5. Similarly, the out-of-context quotation from

17

*Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978), regarding a prosecutor's discretion in making charging decisions so long as there is probable cause, merely recited the general rule of prosecutorial discretion – not the standard for rebutting the vindictiveness presumption once triggered. In fact, the Court went on to write, "[a]nd broad though that discretion may be, there are undoubtedly constitutional limits upon its exercise." *Id.* at 365.

Nor does the R&R's recitation of the government's view of the nature of prosecutions such as this, including last-minute decisionmaking and the Department of Justice's review process for tax crimes, demonstrate a rebuttal of the presumption. While the government certainly made *arguments* to those effects, it offered no *evidence* that such occurred here. In fact, the government chose not to make any evidentiary submission, thus choosing to base its opposition solely on whether the presumption was triggered. There is no evidence, for example, that a decision had been made at the Department of Justice, outside this District, to prosecute Mr. Kesner specifically or, if so, when the prosecutor sought that decision. Nor is there any evidence that the government otherwise made the decision to act against Mr. Kesner earlier. As set forth above, all evidence is to the contrary. The government's burden was to come forward with *evidence*, such as a change in circumstance or change in inculpatory evidence, that could justify the timing of its change in treatment of Mr. Kesner. It did not do so.

This record shows that an improper motive was "reasonably likely," thus giving rise to a presumption of vindictiveness, which the government was tasked with attempting to rebut.

**III.    If the Court concludes that the record of vindictiveness at this stage is inadequate to warrant dismissal, Mr. Kesner should be allowed limited discovery on the issue.**

Even if the Court concluded that there was insufficient indication that vindictiveness was "reasonably likely," Mr. Kesner should be permitted discovery, followed by an evidentiary hearing, concerning the motivations behind the sudden shift in treatment of him. The R&R did

not address this alternative request, other than in a footnote that referred back to its analysis of the request for dismissal. (*See* R&R at 12 n.3.)

But far less of a showing is required to obtain discovery than to achieve dismissal. As this Court held in allowing discovery for purposes of exploring vindictiveness, "[o]f course, Defendant need not yet prove either actual vindictiveness *or the likelihood of vindictiveness*. . . . [T]he court need only address whether discovery on the claim is warranted." *United States v. Dwyer*, 287 F.Supp.2d 82, 88 (D. Mass. 2003) (emphasis added). The First Circuit has described the necessary showing as merely requiring the defendant to "come forth with *'some' objective evidence* tending to show the existence of prosecutorial vindictiveness." *United States v. Bucci*, 582 F.3d 108, 113 (2009) (emphasis added). Mr. Kesner has easily satisfied this standard. He has presented not just "'some' objective evidence tending to show" vindictiveness. He has presented strong evidence of an improper motive: three-plus years' of treatment expressly as a witness; assurances that he was not a target; and a stated intention to serve a third witness subpoena – followed just six days later by a change in his status, *without any change in the evidence*, only after it was clear to the government that it would not succeed in getting Mr. Kesner to abandon his Fifth Amendment rights before concluding its Grand Jury proceedings against Mr. Gibson.

Furthermore, the discovery that Mr. Kesner sought was narrowly tailored to focus on the classification of Mr. Kesner as a witness for three-plus years, the sudden reclassification of him as a target, and evidence learned on or after October 2, 2015. Specifically, Mr. Kesner sought the following very narrow discovery:

1. Evidence that the government contends is inculpatory as to Mr. Kesner and that it discovered on or after October 2, 2015;

2. Transcripts of those portions of the Grand Jury proceedings that relate to Mr. Kesner and that are dated on or after October 2, 2015;

3. Communications, including notes or memoranda of communications, that relate to Mr.

Kesner and that are dated on or after October 2, 2015; and

4. A *log* of communications, memoranda, or other documents that address charging decisions with respect to Mr. Kesner or Mr. Kesner's status as a witness, person of interest, subject, or target.

These requests were narrowly framed to address the specific issue of vindictiveness. *See Dwyer*, 287 F.Supp.2d at 91 (ordering discovery of grand jury transcripts, reports of investigators, and written or documentary information the government received for the relevant time frame related to the new information that the government claimed). The R&R, however, did not assess this request under the proper standard for obtaining discovery.

Adopting the R&R would ensure that prosecutors before this Court would feel free to punish witnesses for invoking well-established Fifth Amendment rights, so long as they were not so brash as to admit expressly that they were doing so. If even discovery were not permitted here, it is difficult to imagine a situation where it would be warranted. Here the limited information about what happened over a six-day period to change the prosecutor's treatment of Mr. Kesner resides uniquely with the government and poses no substantial burden.

**Conclusion**

Based on the foregoing, this Court should decline to adopt the R&R and instead dismiss the indictment as against Mr. Kesner. In the alternative, the Court should permit the limited discovery requested here, followed by an evidentiary hearing on Mr. Kesner's motion to dismiss.

Respectfully submitted,
Mark Kesner,
By his attorney,
/s/ Joshua L. Solomon
Joshua L. Solomon (BBO # 657761)
POLLACK SOLOMON DUFFY LLP
133 Federal Street, Suite 902
Boston, MA  02110
(617) 439-9800
jsolomon@psdfirm.com

20

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on August 24, 2016.

/s/ Joshua L. Solomon